Filed 3/7/22  P. v. Machuca CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ROBBIN MACHUCA,<br><br>  Defendant and Appellant. | B305830<br><br> (Los Angeles County<br> Super. Ct. No. BA048904) |

APPEAL from an order of the Superior Court of Los Angeles County, Juan Carlos Dominguez, Judge.  Reversed and remanded.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

In 1992, a trial jury convicted defendant and appellant Robbin Machuca (defendant), and three accomplices, of three counts of first degree murder and numerous other offenses, including one count of conspiracy to commit murder. It is undisputed that defendant was not the actual killer of the three victims, and that the trial jury was instructed on principles of felony murder and murder liability under the natural and probable consequences doctrine. Years later, in 2019, defendant petitioned for resentencing under Penal Code section 1170.95.[1] After first appointing counsel for defendant, the trial court denied section 1170.95 relief without issuing an order to show cause, concluding defendant was ineligible for relief as a matter of law because if she "were to be tried today, it is this court's opinion that she would be found guilty of [m]urder on both [f]elony [m]urder and [c]onspiracy theories." We consider whether the trial court erred, and the answer to that question really comes down to whether the court appropriately denied relief at the prima facie stage of section 1170.95 consideration.[2]

I

A

Defendant's accomplices in the three murders, which were committed as part of a broader robbery and kidnapping crime spree, were John Lewis, Vincent Hubbard, and Eileen Huber; all were tried together. John Lewis confessed to being the actual

---

[1]    Undesignated statutory references that follow are to the Penal Code.

[2]    Defendant's April 2021 request to augment the record and the Attorney General's request for judicial notice are granted.

killer of the three murder victims—Willie Sams, Elizabeth Nisbet, and Shirley Denogean (there was also evidence Hubbard fired shots at one of the victims too). We shall summarize the facts of the crimes by drawing substantially on our Supreme Court's published opinion resolving codefendant John Lewis's appeal. (*People v. Lewis* (2008) 43 Cal.4th 415.)

"In July and August 1991, [John Lewis] was living in apartment E of the Woodside Village Apartments in West Covina with codefendants Huber ([John Lewis's] girlfriend), [defendant] ([John Lewis's] half sister), and Hubbard ([defendant's] boyfriend)." (*People v. Lewis*, *supra*, 43 Cal.4th at 432.) At "[a]bout 9:30 p.m. on August 18, 1991, Willie Sams drove his car to . . . Security Pacific Bank . . . . From a gas station across the street, [John Lewis] saw Sams drive up to the drive-through ATM. [John Lewis] and codefendant Hubbard approached Sams's car and got in. Pointing [a] Ruger handgun at Sams, [John Lewis] forced him to withdraw $200 from that ATM and then to drive to another Security Pacific Bank and withdraw another $600.

"[John Lewis] drove Sams to Edgewood Middle School . . . . [John Lewis] and Hubbard forced Sams to get into the dumpster near the baseball field. [John Lewis] and Hubbard each fired several shots at Sams, killing him. [John Lewis] later removed the radio from Sams's car, attempted to wipe his fingerprints off the car, and abandoned the car in a shopping center parking lot.

"Shortly after 11:00 p.m., West Covina police officers found Sams's body. Several copper-jacketed bullets or bullet fragments were recovered from the dumpster.

"A couple of hours later, at 1:07 a.m., $60 was withdrawn from Sams's bank account using an ATM.

"On August 19, 1991, . . . Hubbard and [defendant] attempted to use Sams's credit card to purchase about $700 worth of clothing from a store in El Monte. When the attempted purchase was denied, Hubbard and [defendant] hurriedly left the store.

"Sams's car, minus its radio, was recovered two days later in the shopping center parking lot. Fingerprints on the car and on papers found in the car matched [John Lewis's] prints. [Defendant's] prints were [also] found on papers in the car.

[¶] . . . [¶]

"Around 11:30 a.m. on August 24, 1991, Neil Nisbet and his wife Elizabeth drove their car to the Puente Hills Mall. Elizabeth was wearing or carrying several items of jewelry, including a gold ring with 17 diamonds, a gold bangle bracelet, and a gold rope chain bracelet. Elizabeth waited in the car while Neil entered the mall to run an errand. When Neil returned about 10 minutes later, the car and Elizabeth were gone. Neil searched for Elizabeth for several hours and then called the police.

"Meanwhile, [John Lewis], . . . [defendant], and possibly one or more other codefendants arrived at the Puente Hills Mall in codefendant Huber's car, parked, and saw Elizabeth Nisbet in her car. [John Lewis] forced his way into the car and pointed his gun at Nisbet. One or more of the codefendants bound Nisbet's hands and feet with duct tape. [John Lewis] drove the Nisbets' car to the Covina branch of First Interstate Bank, where he and . . . [defendant] used Nisbet's ATM card to withdraw $400. [John Lewis] then drove to a convenience store in Covina, where an additional $100 was withdrawn from Nisbet's account through

an ATM.  [John Lewis] then drove north on the 605 freeway, followed by codefendant Huber's car.  After stopping along the side of the freeway, [John Lewis] shot and killed Nisbet.  [John Lewis] or one of his codefendants removed Nisbet's jewelry, and they departed in Huber's car.

"About 3:10 p.m. that same day, California Highway Patrol officers found the Nisbets' car on the northbound 605 freeway.  Elizabeth Nisbet's body was under a blanket on the rear floorboards.  The body was not yet cold.

"Elizabeth Nisbet had a gunshot wound to her left temple, which caused her death, and there were several gunshot wounds to her left arm and hand.  She had a large blunt force trauma injury between her eyes, lacerations on her cheeks and lips, blackened eyes, and bruises on her wrists and hands.  Holes in the blanket covering her indicated shots were fired through the blanket.  Fragments of duct tape were attached to her socks and to her right forearm, and a twisted ring of duct tape was found underneath her body at approximately waist level.  Three bullets were recovered from various locations inside the car.

"Several fingerprints lifted from the Nisbets' car and from an ATM receipt found in the car matched [John Lewis's] fingerprints.  A forensic scientist from the Los Angeles County Sheriff's Department determined that the duct tape used to bind Elizabeth Nisbet's feet came from a roll of tape that was [later] recovered [by police] from a nightstand in the bedroom of apartment E in West Covina . . . .

[¶] . . . [¶]

"Between 12:15 p.m. and 1:00 p.m. on August 27, 1991, Shirley Denogean drove her Mercedes Benz car to the Puente Hills Mall.  Meanwhile, [John Lewis], codefendant Huber, and at

5

least one other codefendant drove to the mall. . . . [John Lewis] saw Denogean arrive, enter the mall, and return about 20 minutes later.  As she was getting into her car, [John Lewis] forced his way at gunpoint into the car.  One or more of the codefendants tied Denogean's hands in front of her with . . . plastic ties.  [John Lewis] drove Denogean to the First Interstate Bank's City of Industry branch, where $400 was withdrawn from Denogean's account.  [John Lewis] then drove Denogean to another branch of the same bank, where Huber withdrew another $100 from Denogean's account.  Several unsuccessful attempts to withdraw more money from Denogean's account were made at various ATM's.

"[John Lewis] drove Denogean's car west on the Pomona Freeway, stopping between the Rosemead and San Gabriel Boulevard exits.  Codefendant Huber followed in her car.  [John Lewis] forced Denogean at gunpoint to walk down an embankment, to an area surrounded by bushes.  Once there, [John Lewis] fired three shots at Denogean, killing her.  [John Lewis] and his codefendants then drove away.

"About 12:04 a.m. the next day, $220 was withdrawn from Denogean's bank account through an ATM at a convenience store.  Denogean's car was found in El Monte that same day.  Fingerprints on the car and on papers found in the car matched [John Lewis's] and . . . [defendant's] prints.

[¶] . . . [¶]

"Codefendant Huber was arrested about 2:30 a.m. on August 30, 1991. At 3:15 a.m., [John Lewis] and . . . [defendant] and Hubbard were arrested at apartment E in West Covina. [¶] . . . [¶]  Several plastic ties of the kind used to bind murder victim Shirley Denogean's wrists were found in the dishwasher

6

and in the hall closet.  The roll of duct tape that had been used to bind murder victim Elizabeth Nisbet was found inside the nightstand in the bedroom  [¶] . . . [¶]  The search also revealed several items of the victims' property, including Denogean's white purse, credit card, camera, and diamond engagement and wedding ring set, and the radio from murder victim Willie Sams's car.  At the time of her arrest, [defendant] was wearing several pieces of murder victim Elizabeth Nisbet's jewelry.  [¶]  After his arrest, [John Lewis] made four statements to law enforcement officers in which he admitted killing . . . Sams, Nisbet, and Denogean." (*People v. Lewis*, *supra*, 43 Cal.4th at 436-439.)

The trial jury convicted defendant of conspiracy to commit murder (and other crimes); the murders of Sams, Nisbet, and Denogean; and numerous other kidnapping and robbery charges.  The jury found true robbery-murder (§ 190.2, subd. (a)(17)(A)), kidnapping-murder (§ 190.2, subd. (a)(17)(B)),  and lying in wait (§ 190.2, subd. (a)(15)) special circumstance allegations attached to each of the murder counts.  The jury also found true a multiple murder (§ 190.2, subd. (a)(3)) special circumstance allegation. The trial court sentenced defendant to life in prison without the possibility of parole.


B

Defendant sought section 1170.95 relief, via a form petition, claiming she was convicted of first or second degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine and could not be convicted of murder because of changes made to California murder law that took effect in 2019.  The People opposed defendant's petition and, after hearing argument from counsel at two hearings, the trial

7

court denied the petition. A three-page order memorializing the court's ruling states defendant was not the victims' actual killer and was convicted of "three counts of First Degree Murder under a Felony Murder Rule theory" (plus conspiracy to commit murder). The order recites the facts of the murders, tracking the discussion in an unpublished opinion issued by another panel of this court, and states notwithstanding that opinion's "findings," the trial court "further evaluated this matter in light of the [*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)] decision." The order explains why defendant's conduct "satisfies" several of the considerations outlined in *Banks*, finds defendant was a major participant who acted with reckless disregard for human life (with no further elucidation of that reckless disregard), and concludes defendant "has failed to make a *Prima Facie Case* that she is entitled to the relief requested."[3] (Original italics.)

---

[3] During the second of the two hearings held by the trial court, there was an exchange between the court and the attorneys with respect to how the section 1170.95 procedure should operate. The court asked the prosecution whether the court had "to determine whether [defendant's] made a prima facie case, and if [it] determine[s] that there was enough evidence to convict her of something else, [it] just simply den[ies] her case." The prosecution responded, "Correct." The court later sought to confirm whether that should be the result at the "prima facie evidence stage," and the prosecution responded, "Absolutely, yes . . . ." The court then asked, "If I find a prima faci[e] case, then we need an evidentiary hearing and the standard of proof would be beyond a reasonable doubt?" The prosecution responded, "Exactly." The court asked defense counsel if he concurred and counsel said he did.

## II. DISCUSSION

As recently explained by our Supreme Court in *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*), the prima facie inquiry under section 1170.95 is analogous to the inquiry undertaken in habeas corpus proceedings: A """court takes [a] petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause.""" (*Lewis*, *supra*, 11 Cal.5th at 971; see also *id.* at 972 ["the 'prima facie bar was intentionally and correctly set very low'"].) Thus, it is only where the record of conviction (see generally *id.* at 970-972) indicates a petitioner is ineligible for relief as a matter of law does a court correctly deny a section 1170.95 petition at the prima facie stage without issuance of an order to show cause. (*Id.* at 966.) Applying these principles in this case, each of the three theories the Attorney General offers for affirmance are unavailing.[4]

The Attorney General first argues defendant is ineligible for section 1170.95 relief as a matter of law in light of the jury's true findings on the lying in wait murder special circumstance allegations attached to each murder count in question. Specifically, the Attorney General believes these true findings, in conjunction with the jury instructions given, establishes the jury found defendant intended to kill the three victims and the

---

[4]     We agree with the Attorney General that we are not limited to considering the trial court's rationale and we instead judge the correctness of the bottom-line denial of section 1170.95 relief.

9

Attorney General contends the existence of this asserted intent means defendant is ineligible for section 1170.95 relief.

Defendant's jury was instructed that the lying in wait special circumstance could be found true only if "[a] defendant" intentionally killed the victim and the murder was committed while lying in wait.[5] The actual killer in this case was John Lewis, and the lying in wait special circumstance findings as to him were later reversed by our Supreme Court in *People v. Lewis*, *supra*, 43 Cal.4th at pages 511-515.[6] In light of the absence of a requirement that the jury find defendant intended to kill and our Supreme Court's reversal of the true findings on the lying in wait special circumstance allegations for insufficient evidence in the actual killer's direct appeal, we believe the special circumstance findings cannot reliably establish defendant's ineligibility for relief at the prima facie stage of the section 1170.95 procedure.

---

[5] The jury was also instructed that the special circumstance could not be found true as to a defendant who was not the actual killer unless the jury found that defendant aided and abetted the crime with the intent to kill *or* aided and abetted the crime as a major participant with reckless indifference to human life. The phrasing of this instruction in the disjunctive demonstrates it did not necessarily require the jury to find defendant had the intent to kill.

[6] Our Supreme Court specifically held the true findings on the lying in wait special circumstance must fall because there was inadequate evidence that the murder victims were killed "while" John Lewis was lying in wait, i.e., "there was a cognizable interruption between the period of watchful waiting and the time the victims were killed." (*People v. Lewis*, *supra*, 43 Cal.4th at 511; see also *id.* at 515.)

The Attorney General next contends defendant's conviction for conspiracy to commit murder establishes she is ineligible for relief as a matter of law because it shows the jury found she harbored the intent to kill such that she could still be convicted of murder under current law. That is the holding of the majority in a recent Court of Appeal case, *People v. Medrano* (2021) 68 Cal.App.5th 177 (*Medrano*). (*Id.* at 186 ["Appellant's conviction of conspiracy to commit first degree murder rendered him ineligible as a matter of law"]; see also *id.* at 182-183 ["Here, *the target offense was first degree murder*. We know this because appellant was convicted of conspiracy to commit first degree murder"].) Unlike *Medrano*, however, the instructions the jury here was given on the elements of conspiracy to commit murder did not require the jury to find she intended to commit *first degree* murder or harbored express malice, i.e., an intent to kill. (Compare *Medrano*, *supra*, 68 Cal.App.5th at 185, fn. 4.) The instructions in this case did not inform the jury it could not rely on an implied malice theory. While implied malice still remains a valid theory of murder, implied malice is not enough under current law to convict a defendant who is not the actual killer for felony murder (§ 189, subd. (e))[7]—and the jury in defendant's

---

[7] The statute provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with

11

trial was permitted to convict on a conceptually straightforward felony murder theory (whereas the jury in *Medrano* was not instructed on felony murder (*Medrano, supra,* at 182)).

Third and finally, the Attorney General argues, as the trial court found in denying section 1170.95 relief, that defendant is ineligible for such relief because she was a major participant in the murders who acted with reckless indifference to human life, and as such, she could be convicted of felony murder even under current law. There does indeed appear to be considerable evidence that would support a conclusion that defendant is a major participant who acted with the requisite reckless disregard—including defendant's knowledge of the violent tendencies of her co-defendants (at a minimum, as to two of the murders); defendant's presence at the scene of the crimes; and defendant's sharing in the spoils obtained from the murdered victims. (This list is not exhaustive.) The problem, however, is the trial court made its decision (a) before issuing an order to show cause (which entitles a defendant to a hearing at which new evidence can be presented (§ 1170.95, subd. (d)(3); see also, e.g., *People v. Smith* (2020) 49 Cal.App.5th 85, 95-96, review granted July 22, 2020, S262835); (b) while expressly considering only the major participant teachings of *Banks, supra,* 61 Cal.4th 788 and not the reckless indifference guidance of *People v. Clark* (2016) 63 Cal.4th 522; and (c) without observing the evidentiary and burden of proof standards that apply under section 1170.95 as just recently amended. (§ 1170.95, subd. (d)(3); Stats. 2021, ch. 551, § 2 [Senate Bill No. 775 (2020-2021 Reg. Sess.)].) These

reckless indifference to human life, as described in subdivision (d) of Section 190.2."

omissions require reversal. Nothing in this opinion, however, should be understood to prohibit the court on remand from finding, beyond a reasonable doubt, that defendant was a major participant in the murders who acted with reckless indifference to human life—particularly if the record looks much the same at a section 1170.95, subdivision (d)(3) hearing as it does now on appeal.[8]

---

[8] We believe the trial court is entitled to request an advance proffer from defense counsel of any new evidence counsel intends to rely on during a section 1170.95, subdivision (d)(3) hearing. If no such proffer is forthcoming, the trial court may decide the matter on the current record, subject to any evidentiary limitations specified in section 1170.95, subdivision (d)(3), after giving counsel the opportunity to argue the matter, if counsel so chooses.

DISPOSITION

The order denying defendant's section 1170.95 petition is reversed and the cause is remanded with directions to issue an order to show cause under section 1170.95, subdivision (c) and to thereafter proceed as required by section 1170.95, subdivision (d).

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

KIM, J.

14